## TAGGART v. UNITED STATES.
### No. 702.

Circuit Court of Appeals, Tenth Circuit.
Feb. 10, 1933.

Rehearing Denied March 16, 1933.

Omar E. Garwood, of Denver, Colo. (Frank D. Taggart, of Denver, Colo., on the brief), for appellant.

Charles E. Works, Asst. U. S. Atty., of Denver, Colo. (Ralph L. Carr, U. S. Atty., of Denver, Colo., on the brief), for the United States.

Before LEWIS and McDERMOTT, Circuit Judges, and POLLOCK, District Judge.

LEWIS, Circuit Judge.

Appellant was convicted of the offense defined by section 338, title 18, U. S. Code (18 USCA § 338), in that he and another made use of the United States postal service in the execution of a scheme and artifice to defraud others of their money and property by means of false and fraudulent pretenses, representations and promises. The scheme and artifice charged was in the operation of the Western Fur Farms, Inc., a corporation engaged in the buying, breeding, selling and handling of Chinchilla rabbits at Denver, Colorado. It was established by a partnership in which appellant was not interested. Later the business was incorporated, and sometime thereafter appellant became interested as a stockholder. In 1928 he obtained control and directed its affairs thereafter.

The corporation's business seems to have been conducted in a legitimate way up to the fall of 1929, except there may be basis for the claim that before that time its catalogs, circular letters and advertisements made extravagant representations about the profits that could be made in raising and selling Chinchilla rabbits.

It seems clear that the source of profits to the Western Fur Farms, Inc., was in the sale of rabbits to those who could be induced to buy them and engage in the raising of rabbits. Its price for three, two does and a buck, was usually $49.00, and its advertisements were for the purpose of inducing purchases. During 1928 and the greater part of 1929 its obligations for advertising alone exceeded $3,000.00 a month.

Appellant controlled and directed its affairs for two years prior to June 10, 1930, when it was turned over to Norman Snodgrass under circumstances which will have later consideration. While appellant was in charge of the Fur Farms for approximately two years, he appears to have been conducting at the same time the Moffat Land and Livestock Company, and for at least part of that time he was employed by the Yelloway Company that was engaged in transportation by motorbus. Henry P. Sebolt was during said two years the active manager of Western Fur Farms, Inc., but subject at all times as it appears to instructions and directions that might be given to him by appellant.

Against the objections and protests of Sebolt, Taggart and the Moffat Company took from the Fur Farms, Inc., $31,533.12 between November, 1928, and June, 1930. However, between June, 1928, and June, 1930, Taggart and the Moffat Company turned over to Fur Farms, Inc., $11,434.50 to be used in the conduct of its business, and during the time last stated its receipts were $275,787.66. Obviously these receipts were principally from the purchase of rabbits by those who were induced to engage in raising them.

The catalog, widely circulated by Fur Farms, Inc., through the United States mail, set forth at length the business success that could be expected in the raising of Chinchilla rabbits and the profits that would ac-

crue therefrom, and estimated the progeny of two does and a buck over a period of thirteen months to be approximately 171 in the absence of unexpected sickness and defective animals, and this it was said showed the "immense possibilities of this wonderful business." Many of its advertisements promised to give each purchaser of breeding rabbits a contract to buy back from the purchaser at $4.00 each all standard Chinchilla rabbits which were the direct descendants of those sold to the purchaser that should be sound and in good condition. The contract, however, gave the purchaser the right to sell elsewhere. It agreed to pay the express on the rabbits it sold and those it should purchase. The contracts were limited in time. The form of one found in the record was limited to three years from date. This form was being offered and executed as late as April, 1930.

In the late fall of 1929 breeders made many shipments. The Fur Farms was without funds, and some of the shippers were not paid. The unpaid amount for rabbits shipped in the latter part of 1929 to June 4, 1930, was $2,299.13, represented by checks that had been made out and signed by Sebolt but which he did not send out because of lack of funds in the banks on which they were drawn. During the same period of time that indebtedness occurred, the records of the corporation show that it sold rabbits to intending breeders to an amount in excess of $40,000.00, and the receipts of the company during that time were more than $40,000.00. The record indicates that rabbits purchased from its customers were in part resold to other customers and in part their pelts were disposed of on the market. The pelts brought two to three dollars each in 1928. In the first half of 1929 they brought from twenty-five cents to $1.50, and after the middle of that year they were sold at eighteen cents per pound. It took about twelve pelts to make a pound. Obviously Fur Farms made no profit on pelts even at the highest market, but sustained a loss.

In the late fall of 1929 and thereafter Fur Farms was without funds to meet its obligations. Under the direction of appellant it exerted efforts at that time and thereafter to sell its breeding rabbits. In March, 1930, at the direction of appellant a circular letter was prepared for that purpose. Appellant assisted in its preparation, and notwithstanding it was not at that time paying for rabbits shipped by its customers, the circular said:

"We want 5,000 more customers shipping us their Chinchillas to supply the demand this year. We must have more contract holders and in order to get them we are making the most liberal offer in our history. * * *

"Here's what you get if you order now:

"Our check for $4.00 good toward the purchase of your breeding stock.

"Our Anniversary Gift Doe, absolutely free. * * *

"The Western Fur Farms, Inc., absolutely Ironbound contract to buy back your standard Chinchillas at $4.00 each (at times demand has been so great we have paid $5.00 and over to our contract holders) and on which the Western Fur Farms agrees to pay express both ways, and if you are dissatisfied to send your money back.

"And to think you can actually start for as little as $45.00 plus the enclosed check of ours. * * * *"

That circular was intended for mailing and was mailed.

In June, 1930, a post office inspector talked with Taggart and Sebolt about Fur Farms, Inc., and its business. Taggart stated to him that he had caused large amounts of money to be transferred from Fur Farms to the Moffat Company, but he said Fur Farms owed him, that he had put in more money than he had ever taken out. The inspector asked him if it would not have been better to have left the money with Fur Farms so that people who were shipping rabbits could be paid for them. Appellant replied: "What's the difference. It is all mine. I could have declared a dividend. That would have been all right."

In the spring of 1930 Fur Farms owed Snodgrass more than $8,000.00 for advertising. Fur Farms had no money. Snodgrass was pressing them for the $8,000.00 due him. As early as March of that year either Snodgrass or Taggart suggested that Fur Farms' business might be turned over to Snodgrass and he would manage it until enough could be obtained to pay its creditors. Snodgrass testified that Taggart made the proposition to him, and that Taggart said that "as we were both broke, that we run as much advertising as we could, and then just not pay the bills; just pocket it." The negotiations resulted in all of the business and affairs of Fur Farms being turned over to Snodgrass on June 10th or 11th, 1930. It does not appear in the record just what was turned over to Snodgrass. Snodgrass continued in charge for five or six weeks and then quit. Snodgrass' task was to get the Fur Farms out of debt, but he failed.

Errors assigned challenge the refusal of the court to instruct a verdict of not guilty, that the verdict has no support, and that the proof was all by circumstantial evidence, and was as consistent with innocence as with guilt. It is further assigned that the court erred in refusing appellant's request to give tendered instructions to the jury and in the instructions that the court gave of its own motion. We think it sufficient to say that on the proof the court properly submitted the case to the jury, that there was no prejudicial error in the instructions given by the court of its own motion, and that those given by the court embodied the principles in appellant's requests. The remaining assignments are directed to evidence admitted over appellant's objections and evidence offered by appellant and rejected by the court on objection of the district attorney; also that the court admitted in evidence over objections a large number of exhibits, many of which are not brought up by the record; and as to those brought up we are not able to say they were not competent and material. A great part of the proof was directed to the general conduct of the business of Western Fur Farms, Inc., prior to the late fall of 1929, including catalogs, circulars, advertisements and letters that had been prepared for mailing and were mailed, some perhaps before Taggart took control, but that is not clear from the record, and some changes in them or additions to them were made after his control. The court, however, made it clear to the jury that there was no evidence of intent to defraud during the early conduct of the business, but that a legitimate business might be converted into a scheme to defraud.

The argument at the bar for appellant was confined almost entirely to the contentions that there was no proof to support a finding that Taggart ever formed or participated in forming a scheme to defraud, that he never intended to defraud anyone, and that he never mailed or directed anyone else to mail any of the letters or circulars that went out through the mails. But the proof is convincing beyond doubt that Taggart had complete control over the business from sometime in 1928 until he turned it over to Snodgrass in June, 1930; that Sebolt, the nominal manager, was subject to the directions given to him by Taggart; that he engaged the services of other employees of the Fur Farms during that time; that in March, 1930, he assisted in the preparation of a circular letter, to which reference has been made; that he knew this letter or circular was prepared for distribution through the United States mails, and it was sent through the mails; and this was at a time when Taggart knew the Fur Farms could not meet the obligations of its contracts with its customers or pay its past due advertising charges. It was not necessary that Taggart deposit in the mails with his own hands these circulars. If he aided or assisted others in doing so, he became a principal under the statute in the act. We do not doubt the facts were ample to require a submission of the case to the jury, and we find no reversible error in the trial proceedings.

Affirmed.